Call the next case, which is Soobrian v. Atty Gen 08-4626, Mr. Morley and Mr. Smullo. Good morning, Your Honors. My name is Stephen Morley. I represent the petitioner Ronald Soobrian. I request three minutes for rebuttal. It's fine. Thank you, Judge. Ronald Soobrian, as you know, arrived in the United States with his family as a child in 1974. He's about eight years old. Through no fault of his own, he developed serious mental illness over the years. We're familiar with the record. Maybe, unless my colleagues want to do it differently, maybe if you would just go straight to the CAD argument, the Convention Against Torture. Yes, Judge. In this case, Immigration Judge Walter Durling made a series of very specific findings. They are, I believe, at page A80 in the record, in the appendix. They're also at page 14 in slightly larger print in my reply brief. Yeah, it looks like he made seven findings, with some of them broken down into subparts. Yes. And he went through why he found a particular chain of events would lead to Mr. Soobrian's eventual torture, as that is defined in the regulations. Let's put it this way. The likelihood, more likely than not, that that would be the result for Mr. Soobrian. All right. Let's assume, even if you could show that the mentally ill or a particular social group, is there actually any evidence that the government would improperly care for these people, or not adequately protect them, out of an intent to harm or persecute them? That, to me, is a question. Judge, I think that addresses the social group question, and I was talking about the Convention Against Torture. I'm happy to address the social group question, but I don't think we need to show that for Convention Against Torture. For Convention Against Torture, we simply need to show, and Judge Durling found that we had shown, that he would be, you know, that this series of events was more likely than not to happen at each event, at each stage. And the PIA merely termed them suppositions, without engaging in fact-finding. Are you saying that intent or motivation has nothing to do with the CAC claim? The IRS says otherwise, right? Intent or motivation has to do with, it has to be specific intent to inflict the harm, to inflict the pain. Right, right. But isn't that the same as Judge Van Antwerpen's claim? I understood Judge Van Antwerpen's question to be the intent to, by a social, in terms of a social group. The social group goes to withholding, goes to withholding claim. The PIA doesn't really decide whether or not the mentally ill are a particular social group, but let's put that aside. Okay. What I want to know is what the evidence is that the government would intentionally try to harm or persecute these people. In other words, they would treat the mentally ill badly. I think that forms the backdrop. But I think what I would, what I do to your judge is I look at two things. One, I look at the last finding of fact that Judge Durling made, not rebutted or found to be clearly erroneous by the PIA, in which he says, the respondent's certain exposure to arrest and detention will likely result in the intentional infliction of severe pain or suffering at the hands of police, prison guards, or fellow prisoners. Without prison authority interference, due to a total lack of proper daily medications, he will be unlike, he will unlikely be capable of obeying or understanding orders and directors from authorities. Let me see if I can just put that in simplistic terms. It sounds like what he is saying, Judge Durling, is that normally there would not be any intentional infliction of pain, but when this person who's going to be on the streets is told to do something, doesn't do it, as he did not do it in this country, many times, then he will be treated very, in a very rough way by the police, and that Judge Durling thought that that would, found that that would have to do it. That is precisely Judge Durling's finding that was never found to be clearly erroneous. Doesn't the government allow that to happen intentionally to persecute these people? I think what we're talking about here is the intentional infliction of pain, or the threat of the intentional infliction of pain, because the regulations provide that, or the imminent threat of death, the regulations also provide for that, and I think what we're talking about here is that this is the more likely than not result of somebody who is so mentally ill, once in custody, the police are going to use undue force and actually torture, because there's record evidence of use of torture by this poorly trained police force. They will inflict pain because he's being confrontational, because he's not obeying what they're saying, and there's also some evidence from the, albeit not directly cited by Judge Durling, but is in the record, in the testimony of the expert, that he would suffer at the hands, because he's Indo-Guyanese, and most of the police are Afro-Guyanese, so that there's a tendency to, that there's an ethnicity-based claim here as well, that he would suffer because of his different ethnicity at the hands of the guards. I mean, you have to show the goal or purpose, you know, governmental goal or purpose of inflicting severe pain or suffering. I mean, it's a specific intent thing. I think the specific intent in Pierre is the intent to inflict pain. The separate goal or purpose is for a particularized purpose. So in this case, what we have is a deliberate and specific intent as found by Judge Durling to, or inferentially found by Judge Durling, to control a person who continues to act out, and that they will do so by using torture. What's the purpose? To get him to conform, to get him to. . . Yeah, but it's not the intent of the police. It's the intent of the government, isn't it? Well, the police are part of the government. I don't think. . . Then they will be, but it's not the police. It's the intent of the government that you have to show, isn't it? No, we have to show the intent of some governmental authority, and that would include the police. We do not have to show that there is some generalized. . . We don't have to show that it's the central government that is engaging in torture. An arm of the government, such as the police, engaging in this kind of conduct, is certainly within the ambit of the Convention Against Torture, particularly where we have such well-documented evidence of the lack of proper supervision, the poor training of the police. In that sense, Judge, we can look to the government's role in creating the circumstances that allow these police officers to continually engage in this conduct. And the evidence also shows the record, the contrary conditions, that there are, you know, that the police engage in torture on a fairly regular basis. I mean, that's what the State Department reports say. So my problem with this case is that the BIA seemingly applies, matter of JFF, which says chain of events not sufficient. You have to show burden. You have to beat your burden to prove at each level. And, in fact, has never found Judge Durling's facts to be wanting. Has never. . . It did not apply the clearly erroneous standard. And, in fact. . . Roberts. Can I ask you. . . Your adversary alerted our attention to the Kaplan case, a fine opinion by Judge Ambrough. You haven't had a chance to respond to that. I haven't had a chance to respond to it. Can you do so now? Certainly. I think the Kaplan case supports our view. Okay. I think this Kaplan case is exactly the problem that faced this court in Kaplan, faces this court in this case. Kaplan says that you cannot. . . They reviewed, you know, the IJ. They can. . . The IJ's prediction that he would be tortured. Yeah. Kaplan says he can't. And they didn't review the IJ's facts. To the extent that the BIA, in this case, minimally reviewed the facts, and I pointed out in my reply brief, they cherry-picked a couple of facts out of context, and I put in my reply brief the entire context. In other words, they looked to some comment to the effect that he would not be. . . And in fact. . . It's clear that there was a finding made that he's normally not violent. Yeah. But he is. . . But he continually, and there's a history in this country, which has availability of medication, where the police do not routinely engage in torture. Certainly any engagement in torture is not condoned. In those circumstances, we have a situation where he still got in trouble on a regular basis with the police. So I'm looking at Judge Durling's facts. He has found by a preponderance of the evidence, not the high burden of proof that the BIA termed required here, and I don't know where they derived that term from. I don't know where a civil preponderance of the evidence, burden of proof has ever been labeled high, and did not and basically did precisely what the court found appropriate. Let's assume for the moment that the BIA in its second decision in 2008 did as they said, that they were going to apply a de novo review standard, and they should have applied a clearly erroneous standard with respect to the findings of fact. The most that gets you is a remand. Isn't that correct? I would hope Your Honors would say. . . I think that probably gets me a remand. I think that. . . I mean, I think Your Honor gets. . . I would hope that Your Honors would say that this is an instance where the IJ's findings were sufficient on the record, but if all I get is a remand, I get a remand, and we're down again, and we're back up again, and I take another shot at the BIA to try to convince them that the facts. . . In effect, he made a finding of fact, and the wrong standard was replied with respect to those particular findings of fact. Don't they get the first bite of the apple? Yes, Judge, they get the first bite of the apple. I'll take a remand in the sense that at least it gives me another chance to argue, and perhaps with the persuasive authority of this Court in Kaplan, as well as some other indications from this Court, that it is not satisfied with the manner in which the BIA seems to continually avoid crediting IJ findings of fact, and perhaps they will do the right thing and honor Judge Durling's facts. He's on the ground. He sees it. Although I think, as when we looked at this in Kaplan, it's easy to understand why, because it was subsequent, I think, to prior to 2002, they could review everything de novo. Yes. So a lot of folks are from the old system, and that's what they understood. There are a lot of new Board members, Judge, and the regulations have been in place since 2002. Yes. Thank you.  Thank you. Mr. Smula? Well, if the Board violated Kaplan, where does that leave us? May it please the Court? Daniel Smula on behalf of the respondent. I do not believe that the, and I do not read this record as the Board violating Kaplan for this specific reason. Well, they said in, I mean, if they had not changed their mind in 2008 from their 2006 decision, you might be right, but they said we're going to put in place a de novo review here, and in light of Kaplan, which obviously came after that, I understand, why would we not remand, at the very least? You wouldn't remand here for the simple reason that there is no evidence, as the Board found, of specific intent to torture. That evidence of specific intent is essentially an element of a Kaplan. But what was left out even there was the very important tale, is that there's no evidence of specific intent to, basically, yes, they don't have a specific intent to torture. But if a person doesn't abide by orders or requests of the police, and he will unlikely be capable of obeying or understanding orders and directives from authorities, and that's what they left out, that person is likely to suffer torture at the hands of the police, or the intentional affliction of pain at the hands of the police. That's not enough under Pierre. And the reason that's not enough is that the police will look at that individual, not for his mental illness, but he's a disciplinary problem. Pierre gets into a really difficult political situation. You can't say to Haiti, or this Court said, you can't say to Haiti that you have to change the quality of your prisons. We understand that the prisons are in very bad shape, but that depends on how one allocates resources within a government structure. Yes. And that those who go back to those prisons are not going to be given the care that they needed. In this particular person's case, he likely would die. Correct. But there was, in Pierre, it wasn't so much that there was the intentional infliction of pain. It was that we don't have the ability to tell another country to change its prison system. Yes, Your Honor. And I think Francois maybe comes more to the point, because the details of the prison conditions in Haiti in the Francois case, which is at 448 of the Federal Fed Third, gets quite specific. Not only is it beatings, which is, you know, certainly. Although I think Francois, in effect, was it not overruled by Pierre? I don't believe it was overruled as to the point of the horrendous prison conditions. It went so far in Francois citing the State Department country reports as saying there were occasionally electric shock, which anybody would acknowledge is torture. But the last word we have is the embank here on Pierre. Certainly, Your Honor. The terrible prison conditions are not something that necessarily is the intentional infliction of pain. And for us to, we're not going to cross that line to say that that's some, in effect, that you have to reallocate resources in order not to have these terrible prison conditions. But here, what you've got is that if a person is a street person, and if the person has a tendency, as this person has, not to obey directions, that, as this person, he found, would do, especially when he's not on his medication, or even sometimes if he is on his medication, that the police will have the intentional infliction of pain. Now, the question is, is that, that's a finding of fact. Is that clearly erroneous? Well, we don't know what the Board would necessarily decide because they applied a de novo standard. As to those specific, I'll call them subsidiary facts if you'll permit me to do so, a clearly erroneous, the Board should have employed a clearly erroneous standard. Given that it cited its published decision in VK, I don't read the record. Yeah, VK is Kaplan, by the way. I saw that. The fundamental issue here, and the reason a remand is not necessary, is the specific intent issue, which is a legal finding. Specific intent to torture is an element. The fact that Mr. Subraian is likely to end up in prison because of his mental health condition puts him in the broad category of Pierre, which is, he was going to prison automatically. It makes you think that specific, that X has a specific intent to torture when A happens, a person not abiding by orders, that that's not a finding of fact. I'm not quite sure I understand you. Could you rephrase that? In other words, the finding was that Subraian's certain exposure to arrest and detention will likely result in the intentional infliction of severe pain or suffering at the hands of the police, prison guards, or fellow prisoners without prison authority interference when, due to a total lack of proper daily medications, he will unlikely be capable of obeying or understanding orders and directives from authorities. That's the finding. That finding puts him in the same shoes as most other prisoners in Guyana, and particularly those who fail to obey orders for any reason. Now, there seems to be some lack of clarity in the record as to whether… But this person, with his psychotic condition, doesn't have the ability to understand and ultimately to consider whether to obey or not to obey. I mean, at least if past is prologue, this person is psychotic. His mother did testify that he is paranoid schizophrenic, which is mental illness, and that goes beyond my knowledge as to… It goes beyond neurosis. It's a psychosis. Okay. Now, so what we have here is a record that says he's likely to end up in prison, and his inability, I'll call it inability to constantly follow directions, will likely lead the prison guards, a poorly trained prison system, to single him out for additional discipline. Now, what that additional discipline may be, we don't know. But the fact is that there's nothing to distinguish Mr. Subraian as somebody who, again, following this fairly lengthy series of events, that, you know, as somebody who will not abide by every direction he's given from another prisoner who, for whatever reason, because he doesn't choose to do so, follow prison directions. The fact is Mr. Subraian will be viewed in the worst-case scenario, which, you know, the findings of fact seem to bear out by I.J. Derling, as a disciplinary problem. And also by, you know, the 2006 decision was a split decision of the BIA. It was a dissent. Yes. And what we've got now is that the following findings, that he's profoundly mentally ill and on a strict daily regimen of medications, that even while medicated, it's difficult for him to carry on even a minimally coherent conversation, that while he is normally not violent, he has a conviction for assault, and that happened while he was medicated, that he has no relatives residing in Ghana, that the mental health care system of Ghana is woefully inadequate and that large segments of the mentally ill population have literal no access to appropriate medical care or housing, that the expert witness of Pine, that his eventual arrest by the police is almost certain, and that was a finding, that it would be almost certain, and then I already read to you the last one, that his certain exposure to arrest will cause him not to obey commands and therefore result in the intentional affliction of pain. Now, maybe that's considered weak, but shouldn't what we do is remand for the proper analysis by the board of this in light of Kaplan? I'm not even going to fault the board. I mean, Kaplan wasn't out when they made their 2008 decision. Again, Your Honor, I don't believe it's necessary here, and let me try a different tack, if I may, and perhaps this may be a little more successful. We'll find out. The Ninth Circuit has a published opinion. I apologize. I found it in the course of preparing for oral argument. It's Villegas v. McKasey, 523 F. 3rd, 984. That case deals specifically with a Mexican citizen's removal diagnosed with bipolar disorder. There were specific clear findings, a fact, if you will, that the mental health facilities in Mexico were horrendous, not dissimilar to prison conditions that Mr. Subrian would face upon his return to Guyana. Now, the Ninth Circuit in that case said not enough. Again, it was a specific intent case, and the Ninth Circuit collected cases. And so far, Pierre would say not enough. Yes. And here, this is where Durling then goes another step and says that this person isn't capable of responding to orders, and because of that, there will be the intentional infliction of pain by police, prison guards, et cetera. It's not so much to deal with the conditions. It's the fact that it doesn't make any difference whether he's in prison or not. This person's in a world of hurt if he goes back to Guyana, and that was a finding. It is a finding. But the failure to find that there is the inadequate discipline, excuse me, the inadequate training of the jail officers, it's the inadequate training of the jail officers that results in his torture. Had Guyana trained their jail officials adequately, in that situation, they'd have the discipline to not mete out this punishment. Maybe on remand that needs to be looked at, but we don't know what the training is. I don't think there's any evidence in one way or the other about adequate or inadequate training of the prison guards. That may be a good tact, but it would seem to be, at this point, there's nothing in the record that I know of that relates to that. That would be the petitioner's burden. It would be, Your Honor, precisely. The petitioner does have the burden to prove that it's more likely than not to prove that he will be tortured. Specific intent. Specific intent, let me be clear, it comes from the language of the CAT itself. It uses the term intentionally inflicted. The torture must be intentionally inflicted. That's from the language of the Convention Against Torture itself. I believe it was a DOJ at the time. It may have been DHS. No matter. The regulation then reads that to mean specific intent. And that legal element is missing here. And that legal element is what permits this court to not remand the case and deny the petition as it now stands. If you send this person back, do you have what makes you think that there won't be the intentional infliction of pain on him in light of this finding? What makes you think it's clearly erroneous? It's not so much that it's clearly erroneous, Judge. The Board, again, you know, nobody is faulting the Board here in light of the regulations and the subsequent issuance of Kaplan. There is nothing in this record, as the Board did note, there's no evidence of specific intent to torture this individual. And for that reason, for that reason, it need not go back to the Board. The finding is that what will occur, it will like certain exposure to arrest will occur and detention will occur and that will likely result in the intentional infliction of severe pain or suffering at the hands of the police, prison guards, et cetera.  That is a finding. But we need to know the reason for the specific intent element. That sounds like an argument on remand, doesn't it? It could be, but a remand would seem here to be rather futile. I mean, the Board has now twice reversed the IJ's cat finding. So it's not clear what the remand would really get us. Where is the petitioner today? Is he in custody? I'm embarrassed to say I forgot to find that out. I believe that he is, but I do not know that for certain. But as I say, my best understanding, and I apologize for not clarifying with DHS, is that he remains in custody. Can I ask you a question about the withholding claim? Yes. It seems that the BIA required a showing of intent to harm, whereas it appears that on account of is the proper standard. I'm sorry to raise that. You seem to say, and you're brief, I guess, that the two are exactly the same. There's no real difference. What do you say? Under the statute, which is 8 U.S.C. 1231 B.3, it's actually because of, which is somewhat interesting to me and somewhat inartful, but be that as it may, they have to, he has to be subject to persecution because of his mental illness. Did the BIA err in requiring a showing of intent to harm, as your adversary says? I'm talking about the withholding claim. No, no, I appreciate that. No, I mean, persecution is inherently motivated by one of the five protected grounds. There's an intent there. It's not so much that you're walking down the street and, you know, persecution, however you may define it under the law, you experience persecution. It has to be for one of the five protected grounds, and the BIA properly found that there wasn't enough evidence to get that far, to say that assuming for the sake of discussion mental illness is a group, he didn't meet his evidentiary burden, and for that reason the board was correct. So it was the proper standard applied by the BIA? Yes, it was. Okay. With respect to the withholding removal claim, certainly as we've uncovered the CAC claim could have been more complete and more accurate. Okay. No further questions? If there are no further questions, I ask the court to deny the petition. Thank you. Mr. Morley. Mental illness, in this case, is the reason Mr. Subrian will be singled out. Counsel argues that anybody who disobeys while in prison conditions and is then brutally beaten and tortured could file a CAC claim, and that's true, but such a person would have a very difficult time meeting his or her burden of proof. In this case, the mechanism by which we're able to establish that it is more likely than not Mr. Subrian will be tortured is because he will be singled out because of his mental illness. This is not we don't need to put him in a particular social group. If it turned out that every prisoner in Guyana, if we had evidence that every prisoner, no matter what happens, is tortured and abused as a routine practice, then that would establish a CAC claim. Here it's the mental illness that forms the trigger, and then his disobedience forms the abuse and the beating and the torture that will be inflicted, more likely than not, be inflicted upon him. So that's that. Counsel also makes a strong argument about the lack of specific intent. Specific intent in this case, in the CAT cases, is derived from the criminal law. Every day in this courthouse and in courthouses across the country, juries and judges find people guilty having established specific intent, making that factual finding that specific intent was found. How do they do that? They do it by inferring from the facts and circumstances of a case. Was there sufficient evidence to demonstrate specific intent? Judge Durling did nothing different in that regard, other than he didn't have to meet it by proof beyond a reasonable doubt. He just had to say, by a preponderance of the evidence, that these guards who are poorly trained, and the expert testimony was that they are poorly trained, that they would not likely, that Mr. Subrian's lack of cooperation, his inability to cooperate, the lack of sensitivity to any kind of mental health issues, would likely result in the abuse that would befall him. That is inferring from the record no different than what a judge or jury does in any specific intent case. So I submit to you that there is evidence of specific intent in this case, and it's more likely, at least more likely than not. If Your Honor has no further questions, I'm completed. Thank you very much. Thank you. Thank you to both counsel for well-presented arguments. We'll take the matter under advisory.